**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sandra S Hoppmann, | No. CV-22-00427-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Pampered Pets & Plants Incorporated, et al., | |
| Defendants. | |

## INTRODUCTION

Sandra Hoppmann ("Hoppmann") worked for Pampered Pets & Plants Inc. ("PPP"), a company owned by Susan Hall ("Hall"), until resigning in December 2021. Hoppmann then sued PPP and Hall under the Fair Labor Standards Act ("FLSA"), Arizona Minimum Wage Act ("AMWA"), Fair Wages and Healthy Families Act ("FWHFA"), and Arizona Wage Act ("AWA"). In response, PPP asserted various counterclaims against Hoppmann.

Although the parties were initially represented by counsel, all of their attorneys have since withdrawn. Because Hoppmann and Hall are individuals, they are allowed to proceed *pro se*, but PPP cannot proceed *pro se* in federal court because it is a corporation. Accordingly, and because PPP has failed (despite multiple warnings) to arrange for new representation, its counterclaims will now be dismissed.

This leaves Hoppmann's affirmative claims against PPP and Hall, as to which Hoppmann has moved for summary judgment. (Doc. 55.) For the reasons stated below, her motion is denied.

**BACKGROUND**

I.      Relevant Facts

Hoppmann worked for PPP as a pet sitter for approximately 10 years, ending December 26, 2021.  (Doc. 8 ¶ 16; Doc. 10 at 3 ¶ 16; Doc. 57 ¶ 5.)  Hoppmann was compensated for her work on a commission basis.  (Doc. 55-1 at 12.)  Hoppmann's scheduled paydays were the 10th and 25th of each month.  (Doc. 55-6 at 13.)  Hall is the sole owner of PPP.  (Doc. 55-1 at 3.)

On November 17, 2021, Hall sent Hoppmann an email asking for a meeting "to talk about a couple of things."  (Doc. 55-6 at 16.)  Hall said they could meet by phone or in person depending on "whatever [wa]s easier for [Hoppmann]."  (*Id.*)  Hoppmann responded the next day by asking to address Hall's questions via email.  (*Id.*)  Hoppmann also stated: "I have yet to receive my paycheck by mail.  I do not have a blank check or deposit slip for the checking account on file to continue direct deposit at this time, so I'm fine with them being mailed to me in the appropriate time frame."  (*Id.*)

On November 30, 2021, Hoppmann sent an email to Hall stating "I have yet to be paid for jobs completed in October that should have been on November 10, 2021."  (*Id.* at 17.)  She then listed various jobs she had performed in October and November 2021.  (*Id.*)

On December 20, 2021, Hall sent a letter to Hoppmann accusing her of "insubordination" through "negative behavior" and "refusal to comply with PPP policy."  (*Id.* at 4.)  The letter further stated that Hoppmann had neglected to sign two required forms (including a non-solicitation agreement) and that she would be terminated by December 31, 2021 if she did not sign and return the forms by then.  (*Id.*)

On December 29, 2021, Hall sent a text message to Hoppmann stating that she had received a text from Hoppmann on December 26, 2021 announcing Hoppmann's resignation.  (*Id.* at 5.)  Hall said she accepted Hoppmann's "resignation date as of December 26, 2021."  (*Id.*)  Hall also stated that she had "in [her] possession the text messages that [Hoppmann] blasted out to [Hall's] PPP clients saying horrible things about [Hall] and offering to personally pet sit for them and not go through PPP in the future."

- 2 -

(*Id.*)  Hall said that Hoppmann was "in possession of PPP property . . . includ[ing] . . . PPP client keys . . . and all PPP property must be hand delivered to [Hall] in person at [her] office . . . on December 30, 2021 at 10:00 am."  (*Id.*)  Hall said she would "hand" Hoppmann her "final paycheck at that time."  (*Id.*)  Hall also told Hoppmann "you are legally bound to my non-solicit agreement, per Arizona law, whether you have signed the form or not.  If you should provide pet sitting service to any of my PPP client's [sic] for the next two years, I will sue you in court and you will pay attorney fees."  (*Id.*)

That same day, Hoppmann texted Hall: "You do not get to dictate or try to bully me on your terms.  All PPP materials will be sent back to you via registered mail.  No client keys are involved.  You have already broken the law by not paying me." (*Id.* at 9.)

It is undisputed that Hall subsequently mailed a $1,162.35 check to Hoppmann, which was dated December 30, 2021.  (Doc. 55-2 at 2-3; Doc. 55-6 at 18.)  However, the parties seem to dispute when the check was mailed.  Hall testified that she deposited it in the mail on December 30, 2021.  (Doc. 55-2 at 2-3.)  However, the envelope in which the check was delivered was postmarked January 13, 2022.  (*Id.*)  When asked to explain the discrepancy, Hall testified: "I have no control over the Post Office and what happens to mail when it leaves my hand."  (*Id.*)  Hall subsequently contended, in response to a wage claim filed by Hoppmann, that this check covered all of the money Hoppmann was owed. (Doc. 55-6 at 14.)

II.     Procedural History

On February 11, 2022, Hoppmann, through counsel, filed a complaint against PPP and Hall in Maricopa County Superior Court.  (Doc. 1-1 at 3-17.)

On March 18, 2022, PPP and Hall removed the action to federal court.  (Doc. 1.)

On March 22, 2022, the Court issued the preliminary order, which among other things stated: "The parties are specifically advised that failure to prosecute, to comply with court orders, or to comply with the Local and Federal Rules may result in dismissal of all or part of this case, default, imposition of sanctions, or summary disposition of matters pending before the Court."  (Doc. 5 at 6.)

On April 7, 2022, Hoppmann filed her operative pleading, the First Amended Complaint ("FAC").  (Doc. 8.)

On April 21, 2022, PPP and Hall jointly answered the FAC.  (Doc. 10.)  PPP separately asserted counterclaims for (1) violation of the Defend Trade Secrets Act and Arizona Uniform Trade Secrets Act, (2) tortious interference with business expectancy, (3) defamation, and (4) conversion.  (*Id.*)

On May 12, 2022, Hoppmann filed an answer to PPP's counterclaims.  (Doc. 12.)

On May 23, 2022, the Court issued the scheduling order, which warned that "failure to meet any of the deadlines in this Order or in the Federal or Local Rules of Civil Procedure without substantial justification may result in sanctions, including dismissal of the action or entry of default."  (Doc. 15 at 8.)

On January 27, 2023, PPP's and Hall's counsel moved to withdraw.  (Doc. 35.)

On February 15, 2023, the Court granted the motion to withdraw.  (Doc. 46.)  The Court noted that "Hall . . . is now proceeding *pro se*" but PPP "may not appear before this Court *pro se* and must obtain new counsel before filing any briefs or pleadings in this action."  (*Id.* at 6.)

On February 22, 2023, Hall was deposed.  (Doc. 55-1.)  Among other things, Hall testified that Hoppmann was "paid more than . . . the hourly minimum wage 90 percent of the time."  (Doc. 55-2 at 62.)  As for the instances in which Hoppmann was not paid the minimum wage, Hall testified that some of Hoppmann's pet-sitting services included "live-ins" where Hoppmann would stay at the client's home for 18 hours, and Hoppmann may not have been paid the minimum wage for 18 hours on those occasions.  (*Id.* ["[I]t's an 18-hour live-in . . . [s]o I do need to calculate that, and I think that there's minimum wage discrepancies on my part, so that, I want to address."].)  Hall acknowledged that Hoppmann was not timely compensated "work performed at or about October 25," that Hall didn't "believe [Hoppmann] had a check in November," and that "[Hoppmann] did not have a check before . . . December 29th . . . ."  (Doc. 55-1 at 29-30, 41.)  Hall attributed these delays in part to Hoppmann's failure to provide a direct deposit slip.  (*Id.* at 29-30 ["Q.  So

you withheld the funds from her because she wouldn't comply with your policy for getting a direct deposit?"  A.  "It was her choice."].)  Hall also testified that she now understands "there's sick time that an employer needs to pay," that she is "willing to do that," and that Hoppmann was not bound by the non-solicitation agreement given that Hoppmann never signed it.  (*Id.* at 31-32; Doc. 55-2 at 61.)

On March 29, 2023, Hoppmann's counsel moved to withdraw.  (Doc. 48.)

On March 31, 2023, the Court denied the motion without prejudice.  (Doc. 49.)

On April 14, 2023, Hoppmann's counsel again moved to withdraw.  (Doc. 51.)

On April 17, 2023, the Court granted the motion.  (Doc. 53.)  The Court also reminded PPP that it "cannot proceed *pro se* and must retain counsel prior to participating further in this action."  (*Id.*)

On May 12, Hoppmann moved for summary judgment on all of her claims and on all of PPP's counterclaims.  (Doc. 55.)

On June 12, 2023, Hall responded to Hoppmann's motion.  (Docs. 56, 57.)  PPP still had not retained new counsel and did not respond.  Hoppmann did not file a reply.

On January 19, 2024, the Court issued an order stating that PPP "still is not represented by counsel, despite the Court's issuance of multiple notices that PPP cannot proceed pro se and must retain counsel before participating further in this action. Accordingly, if no counsel has filed a notice of appearance on behalf of PPP by January 26, 2024, the Court will dismiss PPP's counterclaims."  (Doc. 59, citations omitted.)

On January 26, 2024, Hall filed the following response: "On behalf of [PPP], Hall advises this Court that she is unable to procure representation in this matter in order to continue with the Counterclaim filed on behalf of [PPP], only. . . .  Hall, on behalf of PPP . . . understands that the Court will dismiss PPP's counterclaims."  (Doc. 60.)

…

…

…

…

- 5 -

**DISCUSSION**

I.    PPP

Before turning to the merits of Hoppmann's summary judgment motion, it is necessary to address the consequences of PPP's failure to arrange for new representation following the withdrawal of its counsel.

A.    **PPP's Counterclaims**

PPP has ceased pursuing its counterclaims and did not arrange for new representation, despite multiple warnings, after its counsel withdrew.  Given this backdrop, the Court will dismiss PPP's counterclaims for failure to prosecute and failure to comply with court orders.  Fed. R. Civ. P. 41(b) ("If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it."); *see also Nomo Agroindustrial SA De CV v. Enza Zaden N. Am., Inc.*, 2008 WL 11340030, *1 (D. Ariz. 2008) ("A case may be dismissed if a corporation fails to timely obtain counsel to proceed in federal court."); *Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 23 (2d Cir.1983) ("The order dismissing the complaint unless Development obtains counsel to represent it within 45 days is affirmed.").  This, in turn, moots Hoppmann's summary judgment motion to the extent it seeks summary judgment on PPP's now-dismissed counterclaims.

The Court has the power to order dismissal under Rule 41(b) *sua sponte* and may dismiss only a part rather than the whole of a suit.   *Hells Canyon Preservation Council v. U.S. Forest Service*, 403 F.3d 683, 689 (9th Cir. 2005).  When "determining whether to dismiss a claim for failure to prosecute or failure to comply with a court order, the Court must weigh the following factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to defendants/respondents; (4) the availability of less drastic alternatives; and (5) the public policy favoring disposition of cases on their merits." *Pagtalunan v. Galaza*, 291 F.3d 639, 642 (9th Cir. 2002).  Dismissal is proper "where at least four factors support dismissal, or where at least three factors strongly support dismissal." *Yourish v. California Amplifier*,

191 F.3d 983, 990 (9th Cir. 1999) (cleaned up).   Nevertheless, "[t]his 'test' is not mechanical.  It provides the district court with a way to think about what to do, not a set of conditions precedent . . . or a script that the district court must follow." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007).

As for the first factor, PPP has failed to prosecute its counterclaims and failed to heed repeated warnings concerning its need to retain counsel.   (Docs. 46, 53, 59.) Accordingly, the first factor favors dismissal.   "[T]he public's interest in expeditious resolution of litigation always favors dismissal" and can "strongly" support dismissal. *Yourish*, 191 F.3d at 990.

As for the second factor, PPP's failure to arrange for new representation (which is a prerequisite to its continued participation in this action), let alone make any effort to support its counterclaims or respond to dispositive motions, has frustrated the Court's ability to manage the docket.

As for the third factor, the risk of prejudice to Hoppmann (the counter-defendant) weighs in favor of dismissal.  Allowing PPP's counterclaims to proceed despite PPP's nonparticipation in this case for almost a year would unnecessarily delay the resolution of those counterclaims and complicate Hoppmann's ability to defend herself against them. *Parker v. Shaw & Lines, LLC*, 2010 WL 1640963, *2 (D. Ariz. 2010) ("It is axiomatic that, as time passes, it becomes harder for Defendants to defend the action as witnesses become unavailable and memories fade.").

As for the fourth factor, "the public policy favoring disposition of cases on their merits" weighs against dismissal. *Wystrach v. Ciachurski*, 267 F. App'x 606, 608 (9th Cir. 2008).

Finally, when evaluating the fifth factor, the Court must "consider[] lesser sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of case-dispositive sanctions." *Connecticut Gen. Life*, 482 F.3d at 1096.  "In cases involving *sua sponte* dismissal of an action, rather than dismissal following a noticed motion under Rule 41(b), there is a closer focus on . . . failure to consider less drastic alternatives and the

1   lack of warning of imminent dismissal of the case." *Oliva v. Sullivan*, 958 F.2d 272, 274

2   (9th Cir. 1992).

3       Here, PPP has been given repeated warnings that its failure to follow court orders

4   and failure to retain counsel may result in dismissal.  (*See, e.g.*, Doc. 5 at 6; Doc. 15 at 8;

5   Doc. 59.)  The Court has also considered whether less drastic sanctions could be

6   appropriate.  Available alternatives include, for example, "a formal reprimand, imposition

7   of costs or attorney fees, or an adjudication of the motion without the benefit of plaintiffs'

8   arguments in opposition." *Wystrach*, 267 F. App'x at 608.  The Court has considered these

9   options and concludes they would be inappropriate here in light of PPP's failure to retain

10   counsel and pursue its counterclaims for almost a year.  Thus, the Court will dismiss the

11   counterclaims without prejudice, which is the only less drastic sanction appropriate here.

12   *See, e.g., Fader v. City of Phoenix*, 2013 WL 5446676, *2 (D. Ariz. 2013) ("[D]ismissal

13   without prejudice is the only acceptable less drastic sanction in this case.").

14       B.     **Hoppmann's Claims Against PPP**

15       Turning to Hoppmann's claims against PPP, when a corporate defendant initially

16   demonstrates an intent to defend but then fails to retain new counsel after the withdrawal

17   of its initial counsel, the appropriate consequence is to enter a default against that

18   defendant.  *See, e.g., Eagle Assocs. v. Bank of Montreal*, 926 F.2d 1305, 1310 (2d Cir.

19   1991); *Rhino Assocs., L.P. v. Berg Mfg. & Sales Corp.*, 531 F. Supp. 2d 652, 656 (M.D.

20   Pa. 2007) ("As a corporation, Berg must be represented in court by counsel.  The order of

21   court dated May 1, 2007 granted the motions to withdraw by counsel for Berg.  To date,

22   Berg has not secured representation or otherwise communicated with the court despite the

23   order of court dated May 14, 2007 which directed Berg to secure the appearance of counsel

24   and show cause why default judgment should not be entered against it. . . .  Although Berg

25   filed an answer in this action, the entry of default against Berg is nonetheless appropriate

26   for Berg's failure to 'otherwise defend' itself.") (citations omitted).  Thus, through this

27   order, the Court will direct the Clerk to enter a default against PPP.

28       What does this mean for Hoppmann's pending summary judgment motion as it

relates to her affirmative claims against PPP?  Some courts have concluded that a summary judgment motion against a defendant who has defaulted should be denied, because the proper procedure for obtaining judgment against such a defendant is through a motion for default judgment.  *United States v. Spear*, 2023 WL 6463039, *4 (D. Idaho 2023) (reaching this conclusion and citing cases).  However, it appears that courts have followed that approach in cases where the defaulted defendant never made an appearance.  That is not the situation here—at the time Hoppmann filed her summary judgment motion, PPP had previously appeared and was not in default status.  Under these circumstances, it would be inappropriate to deny Hoppmann's summary judgment motion as it relates to her affirmative claims against PPP simply because PPP defaulted after she filed the motion. Doing so would, in effect, penalize her for conduct by a litigation adversary that was outside her control.  This approach also avoids offending "the rule that where a complaint alleges that defendants are jointly liable" or "are similarly situated, such that the case against each rests on the same legal theory," and "one of them defaults, judgment should not be entered against the defaulting defendant until the matter has been adjudicated with regard to all defendants."  *Garamendi v. Henin*, 683 F.3d 1069, 1082 (9th Cir. 2012) (cleaned up).

II.    Summary Judgment Legal Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts."  *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  *See also Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).  At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254.  Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

For "the party with the burden of persuasion at trial" to succeed in obtaining summary judgment, it "must establish beyond controversy every essential element" of each claim on which summary judgment is sought.  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).  The party without the burden of persuasion at trial is entitled to summary judgment where it establishes that the party with the burden of persuasion will be unable to prove at least one element of its claim in light of the undisputed facts.  *Celotex Corp.*, 477 U.S. at 322-23.  This distinction reflects that the burden is ultimately on the proponent of each claim to prove it.  *Id.* ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Where the Court "does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g). However, where "it is readily apparent that the court cannot grant all the relief requested by the motion, it may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial. Even if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established." Fed. R. Civ. P. 56(g), advisory committee's note to 2010 amendment. *See also Kreg Therapeutics, Inc. v. VitalGo, Inc.,* 919 F.3d 405, 415 (7th Cir. 2019) ("Because Rule 56(g) speaks of what a court 'may' do, we review for an abuse of discretion."); *NCWC Inc. v. CarGuard Admin. Inc.*, 2022 WL 17620550, *2 (D. Ariz. 2022) ("The decision whether to grant relief under Rule 56(g) is discretionary."); 2 Steven S. Gensler & Lumen N. Mulligan, Federal Rules of Civil Procedure, Rules and Commentary, Rule 56 (2023) ("[T]he decision whether to enter an order establishing facts is left to the trial court's discretion. No party has a procedural entitlement to have facts established by order.") (footnote omitted).

III.    Hoppmann's Affirmative Claims

A.    **Count One: FLSA**

1.    The Parties' Arguments

In Count One of the FAC, Hoppmann alleges that PPP and Hall violated the FLSA by not compensating her at time and a half for work beyond 40 hours each week. (Doc. 8 ¶¶ 48-56.) In her summary judgment motion, Hoppmann points to payroll records produced by Hall during discovery and asserts that she was underpaid in some weeks. (Doc. 55 at 7-9 ¶¶ 18, 24, 28, 32; *see also* Doc. 55-4 at 2, 3, 36.)

Hall responds that she "disputes that she ever refused to pay Plaintiff." (Doc. 56 at

3.)  Hall further contends that she "paid Plaintiff for all amounts owing to Plaintiff on December 30, 2021." (*Id.*)  Hall also states that she often overpaid Hoppmann and clarifies that she denies many of Hoppmann's specific factual allegations. (*Id.* at 5-6.)  Finally, in the answer, PPP and Hall seem to dispute whether the FLSA even applies here. (Doc. 10 at 4-5 ¶¶ 50-51.)

2.  Analysis

"To establish a minimum-wage or overtime violation of the FLSA, Plaintiff must establish three elements: (1) she was an employee of Defendants; (2) she was covered under the FLSA, and (3) Defendants failed to pay her minimum wage or overtime wages." *Smith v. Nov. Bar N. Grill LLC*, 441 F. Supp. 3d 830, 834 (D. Ariz. 2020) (citing 29 U.S.C. §§ 206(a), 207(a)).  Here, PPP and Hall seem to concede that Hoppmann was an employee. (Doc. 10 at 4 ¶ 39 ["Defendants admit Plaintiff was a PPP employee."].)  Thus, the Court will turn to the second element, FLSA coverage.

"In order to be covered by the FLSA's overtime rules, employees must be 'engaged in commerce or in the production of goods for commerce, or . . . employed in an enterprise engaged in commerce.'  In other words, coverage exists if either the employee is engaged in commerce (individual coverage), or the employer is an enterprise engaged in commerce (enterprise coverage)." *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 914 (9th Cir. 2003) (citations omitted).

For purposes of individual coverage, the employee's work must be "so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity." *Mitchell v. C.W. Vollmer & Co.*, 349 U.S. 427, 429 (1955).  Thus, "[e]mployees are 'engaged in commerce' . . . when they are performing work involving or relating to the movement of persons or things . . . among the several States or between any State and any place outside thereof." 29 C.F.R. § 779.103.  *See also* 29 U.S.C. § 203(b) (commerce is defined as "trade, commerce, transportation, transmission, or communication among the several States or

between any State and any place outside thereof"); *Chao*, 346 F.3d at 914.[1]  Courts must "focus on the activities of the employee[] and not on the business of the employer." *Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959).  This fact-dependent inquiry is "guided by practical considerations, not technical conceptions."  *Mateo v. Auto Rental Co.*, 240 F.2d 831, 833 (9th Cir. 1957).

Hoppmann has not met her initial burden of production as to the individual-coverage element.  She does not address whether her work involved or related to the movement of persons or things between the States, let alone present evidence bearing on that inquiry.  It is also difficult to see how her work as a pet-sitter could qualify.

This leaves enterprise coverage, which attaches where the employee is "employed in an enterprise engaged in commerce or in the production of goods for commerce."  29 U.S.C. §§ 206(a), 207(a).  The term "enterprise engaged in commerce or in the production of goods for commerce" means "an enterprise that—(A)(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated); (B) is engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, a preschool, elementary or secondary school, or an institution of higher education (regardless of whether or not such hospital, institution, or school is public or private or operated for profit or not for profit); or (C) is an activity of a public agency."  29 U.S.C. § 203(s)(1).

Hoppmann has not met her initial burden of production as to the enterprise-coverage

---

[1]    "The FLSA also provides individual coverage where the employee is 'engaged . . . in the production of goods for commerce. . . .'  The Court need not address this alternate theory of individual coverage, however, because [Hoppmann] does not contend that [s]he produced any goods for commerce when [s]he worked for [PPP and Hall]." *Levya v. Avila*, 634 F. Supp. 3d 670, 675 n.5 (D. Ariz. 2022).

element.  PPP is not a hospital or similar institution or a public agency, so it could only qualify as an enterprise if, *inter alia*, its "annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)." *Id.* § 203(s)(1)(A)(ii).  However, Hoppmann has made no effort to show that PPP met that threshold.[2]  Her failure to do so means her request for summary judgment on Count One as to both PPP and Hall must be denied.  *Nissan Fire & Marine Ins. Co.,* 210 F.3d at 1102-03 ("If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything . . . .").

B.    **Count Two: AWA**

1.    The Parties' Arguments

In Count Two of the FAC, Hoppmann alleges that PPP and Hall violated AWA because, "[u]nder the statute, employers are required to pay all wages owed within sixteen (16) days after the end of the pay period," yet "[c]urrently, Hoppmann has not been appropriately compensated for all of Hoppmann's hours worked."  (Doc. 8 ¶¶ 59-60.)  In her summary judgment motion, Hoppmann's sole argument as to this claim is: "PPP and Hall engaged in unlawful employment practices with respect to violation of: The [AWA] . . . by failing and refusing to pay wages."  (Doc. 55 at 9-10 ¶ 35.)

Hall responds that she "never refused to pay wages to Plaintiff" and "disputes that she engaged in any unlawful employment practices with respect to violation of: The [AWA]."  (Doc. 56 at 6.)

…

…

---

[2]    In her motion, Hoppmann asserts that PPP "employs more than 15 employees." (Doc. 55 at 9 ¶ 33.)  In support, Hoppmann cites a letter in which Hall wrote that "[t]here are 50 other employees at PPP." (Doc. 55-6 at 11.)  The letter also suggests that PPP has locations in various cities across Arizona.  (*Id.*)  Although these figures might suggest that PPP is a substantial company, it would still be speculative to conclude from them that PPP has annual revenues of at least $500,000.  In a related vein, although Hoppmann emphasizes that PPP has more than 15 employees, that is the threshold for coverage under the Americans with Disabilities Act ("ADA").  *Buchanan v. Watkins & Letofsky, LLP*, 30 F.4th 874, 877 (9th Cir. 2022).  That threshold is distinct from the FLSA threshold at issue here.

1          2.     Analysis

2          Under AWA, "[e]ach employer in this state shall designate two or more days in each

3   month, not more than sixteen days apart, as fixed paydays for payment of wages to the

4   employees" and "on each of the regular paydays, shall," subject to exceptions that are

5   inapplicable here, "pay to the employees all wages due the employees up to that date."

6   A.R.S. § 23-351(A), (C).   Additionally, "[w]hen an employee quits the service of an

7   employer he shall be paid in the usual manner all wages due him no later than the regular

8   payday for the pay period during which the termination occurred.   If requested by the

9   employee, such wages shall be paid by mail."   *Id.* § 23-353(B).   "[I]f an employer, in

10  violation of [AWA], fails to pay wages due any employee, the employee may recover in a

11  civil action against an employer or former employer an amount that is treble the amount of

12  the unpaid wages."   *Id.* § 23-355(A).

13         The term "employer" is defined more narrowly under AWA than it is under the

14  FLSA or AMWA.   Under AWA, "employer" is defined as "any individual, partnership,

15  association, joint stock company, trust or corporation, the administrator or executor of the

16  estate of a deceased individual or the receiver, trustee or successor of any of such persons

17  employing any person."   A.R.S. § 23-350(3).   This statutory definition does not, in other

18  words, authorize individual liability against the owners, officers, and directors of a

19  corporate employer.   *Rosen v. FastTrakFoods LLC*, 2021 WL 3130333, *1 (D. Ariz. 2021)

20  ("AWA . . . does not authorize liability against individual managerial employees such as

21  Hamilton."); *Loserth v. Accelerated Retention Inst.*, 2020 WL 13268122, *9 (D. Ariz.

22  2020) ("[AWA's] definition of employer—unlike that of the FLSA or AMWA—includes

23  a corporation, but not officers or agents of the corporation") (cleaned up); *Channel v. Home

24  Mortg., Inc.*, 2005 WL 8160525, *5 (D. Ariz. 2005) ("There is nothing in this language

25  suggesting that where an 'employer' is a corporation, the definition is intended to

26  encompass both the corporation and individual employees within the corporation

27  authorized to set an employee's hours and pay wages.").   Because Hall is an individual,

28  and because Hoppmann has made no effort to establish that she was somehow employed

directly by Hall (as opposed to by PPP), Hoppmann is not entitled to summary judgment on her AWA claim against Hall.

The Court also declines to enter summary judgment as to that claim against PPP. When the evidence is construed in the light most favorable to the non-movant, the December 30, 2021 check for $1,162.35 constituted all of the outstanding wages that Hoppmann was owed. (Doc. 55-6 at 14.)

Admittedly, and even putting aside the separate factual dispute over when the check was mailed, it appears that at least some portion of the $1,162.35 constituted overdue wages that should have been paid to Hoppmann by a previous payday, given that Hoppmann apparently was not paid in November 2021 or paid previously in December 2021. (Doc. 55-1 at 29-30, 41.) Still, this undeveloped record does not provide a sufficient basis for awarding, at summary judgment, any AWA damages arising from that seemingly late payment. Although a late wage payment could potentially lead to an award of treble damages under A.R.S. § 23-355, any such award is discretionary. *Swanson v. Image Bank, Inc.*, 77 P.3d 439, 443 (Ariz. 2003) ("[U]nder the plain language of the statute, the award of treble damages for the bad-faith withholding of wages is discretionary with the court."); *Crum v. Maricopa Cnty.*, 950 P.2d 171, 173 (Ariz. Ct. App. 1997); *see also Rosen v. FastTrak Foods LLC*, 2021 WL 2981590, *4 (D. Ariz. 2021) ("The Court possesses wide discretion in determining whether to award treble damages under § 23-355."). "The treble damage remedy is a punitive measure that is warranted when employers seek to delay payment without reasonable justification or to defraud employees of wages earned" and "is appropriate only when an employer withholds wages unreasonably and in bad faith." *Swanson v. Image Bank, Inc.*, 43 P.3d 174, 183 (Ariz. Ct. App. 2002), *vacated in part*, 77 P.3d 439 (cleaned up).

Here, the summary judgment record is too undeveloped to establish that PPP engaged in unreasonable and bad-faith conduct by making the seemingly late payment. Hall's testimony suggests the delay may have resulted in part from Hoppmann ignoring repeated inquiries from PPP for direct-deposit information and refusing to meet with Hall

1    in person.  (Doc. 55-1 at 29-30, 40-41.)  Finally, although it might be possible to grant

2    summary judgment on the issue of liability while leaving the issue of damages unresolved,

3    the Court declines to do so here in light of the array of other issues in this case that will

4    remain unresolved after summary judgment and, thus, will need to be resolved at a later

5    stage of the case.  *Cf. Lateral Link Grp., LLC v. Springut*, 2015 WL 12806468, *3 (C.D.

6    Cal. 2015) ("Defendants have not shown that partial summary adjudication will make pre-

7    trial or trial proceedings more efficient.  Therefore, the Rule 56(g) Motion is DENIED.").

8        C.    **Count Three: AMWA**

9            1.    <u>The Parties' Arguments</u>

10       In Count Three of the FAC, Hoppmann alleges that PPP and Hall "intentionally

11   failed or refused to pay Hoppmann full minimum wages according to the provisions of the

12   Arizona Minimum Wage Statute."  (Doc. 8 ¶ 66.)  In her summary judgment motion,

13   Hoppmann elaborates that PPP and Hall violated AMWA "by failing and refusing to pay

14   minimum wage on various occasions."  (Doc. 55 at 10 ¶ 36.)  Hoppmann specifically

15   asserts that she did not receive a minimum wage for certain types of work, such as "live-

16   ins" and "Get Acquainted (GA)" visits.  (*Id.* at 7, 9 ¶¶ 22-24, 32; *see also* Doc. 55-4 at 2,

17   3, 36.)

18       Hall responds that she "disputes that she failed or refused to pay minimum wage on

19   various occasions and that she is in violation of the [AMWA]."  (Doc. 56 at 6.)  In fact,

20   Hall asserts Hoppmann was "paid excessive amounts over the AZ minimum wage in both

21   2020 and 2021."  (*Id.*)

22           2.    <u>Analysis</u>

23       "To state a claim under the AMWA, the defendant must be an employer under the

24   statute, the plaintiff must be a qualified employee of the defendant, and the plaintiff must

25   allege that she was not paid the applicable minimum wage for hours worked."  *Smith v.*

26   *Helton Brewing Co.*, 2023 WL 5135142, *3 (D. Ariz. 2023) (internal quotation marks

27   omitted).  AMWA does not apply to a "small business," which is defined as "any

28   corporation, proprietorship, partnership, joint venture, limited liability company, trust, or

association that has less than five hundred thousand dollars in gross annual revenue and that is exempt from having to pay a minimum wage under [the FLSA]."  A.R.S. § 23-362(B)-(C).  Thus, "[i]n order to qualify as an employer, the corporation or limited liability company must generate no less than $500,000 in gross annual revenue."  *Smith*, 2023 WL 5135142 at *3.  *See also Tolano v. El Rio Bakery*, 2019 WL 6464748, *8 (D. Ariz. 2019) ("The AMWA . . . explicitly incorporates elements of pre-existing employment statutes, for example by defining 'small business' by reference to the FLSA and by adopting the FLSA's test for whether an employment relationship exists.").

Accordingly, for the same reasons that Hoppmann is not entitled to summary judgment on her FLSA claim in Count One, she is not entitled to summary judgment on her AMWA claim in Count Three.

### D.    Count Four: FWHFA

#### 1.    The Parties' Arguments

In Count Four of the FAC, Hoppmann alleges that PPP and Hall violated the FWHFA in various ways, including "by failing to maintain a paid sick time policy where Hoppmann could accrue paid sick time," "by failing to provide Hoppmann with written notice of Hoppmann's rights under the FWHFA at the time of Hoppmann's employment," and "by employing Hoppmann in the state of Arizona and issuing paychecks without reporting the required information on them."  (Doc. 8 ¶¶ 74-75, 81.)  In her summary judgment motion, Hoppmann elaborates: "Upon being hired and thereafter, Defendant did not post or send Plaintiff written notice of earned sick pay time, and Plaintiff was not paid for sick time." (Doc. 55 at 9 ¶ 33.)  Therefore, Hoppmann asserts that she "is owed $103.20 for 2020" and "$243 for 2021" under A.R.S. § 23-372(A).   (*Id.* at 9-10 ¶¶ 34, 37.) Hoppmann also asserts a right to additional penalties for unpaid sick time under A.R.S § 23-364(G) and for violations of recordkeeping requirements under A.R.S. § 23-364(F).  (*Id.* at 10-11 ¶¶ 37-38.)  Hoppmann also argues that PPP and Hall violated the federal recordkeeping requirements set forth at 29 C.F.R. § 516.2(a)-(c).  (*Id.*)

In response, Hall does not dispute that she failed to provide written notice of (or

actually provide) sick time, but she contends that Hoppmann is only entitled to $39.60 in 2020 and $235.71 in 2021 because "[p]aid sick leave accrues at a rate of 1 hour for every 30 hours worked." (Doc. 56 at 6.) Hall further states that she "does not dispute the error in failing to provide earned sick time benefits but does dispute that [she] willfully refused to provide said benefit." (*Id.*) Hall further disputes that she "engaged in any unlawful employment practices" or "willfully violate[d] any federal or state recordkeeping requirements." (*Id.*)

2.   <u>Analysis</u>

Hoppmann has not, for several reasons, established an entitlement to summary judgment on her claim in Count Four. As an initial matter, some of Hoppmann's liability theories are non-starters. For example, 29 C.F.R. § 516.2 requires employers to keep records for every employee covered by the FLSA's minimum wage requirements. *Id.* ("Every employer shall maintain and preserve payroll or other records containing the following information and data with respect to each employee to whom section 6 or both sections 6 and 7(a) of the Act apply"); *Brennan v. Valley Towing Co., Inc.*, 515 F.2d 100, 111-12 (9th Cir. 1975) ("*Once the company became subject to the overtime provisions of* [§] *207, it was obliged to comply with the Secretary's record keeping regulations . . . .*") (emphasis added). But as discussed elsewhere, Hoppmann has not established she was a covered employee under the FLSA. Thus, she has not established a valid claim under § 516.2.

Turning to her claims under Arizona law, Hoppmann may not seek penalties for any alleged notice or recordkeeping violations. *Vega v. All My Sons Bus. Dev. LLC*, 583 F. Supp. 3d 1244, 1259 (D. Ariz. 2022) ("[A]n employee may bring a private action to recover unpaid sick time wages, but only the ICA can recover civil penalties, not the individual."); *Ariz. Chamber of Com. & Indus. v. Kiley*, 399 P.3d 80, 86 (Ariz. 2017) ("Section 23-364(G) also provides that civil penalties shall be retained by the agency that recovered them and used to finance activities to enforce this article.") (cleaned up); *Arrison v. Walmart Inc.*, 2023 WL 4421425, *7 (D. Ariz. 2023) ("Plaintiffs do not have a private right of action to

obtain civil penalties under their record keeping claim.").

Finally, Hoppmann potentially may recover for uncompensated sick time. A.R.S § 23-364(G). Here, Hoppmann asserts that she "was not paid for sick time" and then calculates the resulting amount she contends she is owed. (Doc. 55 at 9 ¶¶ 33-34.) Hall seems only to dispute the calculations for how much is owed. (Doc. 56 at 6.)

Although there does not appear to be any dispute over liability as to this aspect of Count Four,[3] summary judgment is unwarranted due to, at a minimum, an unresolved factual dispute over the resulting damages. Granted, the parties are not far apart— Hoppmann contends she is owed $346.20 based on the sick-time issue, while Hall contends

[3] Even though, as noted, Hall seems to concede liability as to Hoppmann's sick-time claim, Hoppmann does not cite any evidence in the record that she requested sick-time leave while working for PPP. Instead, the FAC alleges that "Hoppmann attended scheduled medical appointments where PPP would have been obligated to pay for the time she was unable to work had PPP adopted . . . a sick time policy" and that "there were 12 to 23 [such] instances yearly, requiring her to miss up [to] two to three hours each" (Doc. 8 ¶ 43.) Putting aside the fact that there is not (at least to the Court's knowledge) any evidence in the record to substantiate these allegations, which Hall and PPP denied in their answer (Doc. 10 at 4 ¶ 43) and which Hall seemed to dispute during her deposition (Doc. 55-2 at 61 ["[Hoppmann] never, ever said that she was sick"]), it is unclear under Arizona's statutory scheme whether Hoppmann's act of attending scheduled medical appointments would, in the absence of a request for leave to attend those appointments, trigger liability. Under A.R.S. § 23-364(G), "[a]ny employer who fails to pay the . . . earned paid sick time required under this article shall be required to pay the employee the balance of the . . . earned paid sick time owed, including interest thereon, and an additional amount equal to twice the . . . earned paid sick time." Thus, liability turns on whether any earned paid sick time was "owed" to Hoppmann. The starting point for that inquiry is A.R.S. § 23-372, which describes how earned paid sick time is accrued. Notably, that provision clarifies that "[n]othing in this article shall be construed as requiring financial or other reimbursement to an employee from an employer upon the employee's termination, resignation, retirement or other separation from employment for accrued earned paid sick time that has not been used." *Id.* § 23-372(F). Thus, under Arizona law, it appears that a resigning employee such as Hoppmann is not "owed" for any pre-resignation sick time that was "accrued" but never "used." How is sick time "used"? The answer appears to come from A.R.S. § 23-373, which is entitled "Use of earned paid sick time" and explains, among other things, that "[e]arned paid sick time shall be provided *upon the request of an employee*. Such request may be made orally, in writing, by electronic means or by any other means acceptable to the employer." *Id.* § 23-373(F) (emphasis added). As discussed above, it is unclear whether Hoppmann ever made such a request—and, thus, whether she ever "used" her accrued sick time in a manner that might give rise to an obligation that was "owed" to her, and hence actionable under § 23-364(F), even after her resignation. Nevertheless, because this order does not definitively resolve the issue of sick-time leave liability, which the parties addressed in only passing fashion in their briefs, it is unnecessary to further delve into it at this juncture. *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (noting that, under the principle of party presentation, courts "do not, or should not, sally forth each day looking for wrongs to right" and "normally decide only questions presented by the parties") (cleaned up).

that Hoppmann is only owed $275.31—but the bottom line is that the Court cannot, on this record, grant summary judgment to Hoppmann in the manner she requested.  Additionally, as discussed in relation of the AWA claim against PPP in Count Two, the Court concludes in its discretion that this is not an appropriate circumstance to grant partial summary judgment under Rule 56(g).

Accordingly,

**IT IS ORDERED** that:

1.  PPP's counterclaims (Doc. 10 at 9-18) are **dismissed without prejudice**.

2.  The Clerk is directed to enter a default as to PPP.

3.  Hoppmann's motion for summary judgment (Doc. 55) is **denied**.

4.  Hoppmann is reminded of her obligation under the scheduling order (Doc. 15 at 8) to file and serve a Notice of Readiness for Final Pretrial Conference "within seven days after the resolution of the dispositive motions."

Dated this 31st day of January, 2024.

Dominic W. Lanza
United States District Judge